IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 3, 2015

## STATE OF TENNESSEE v. GERALD STEPHEN CASSELL AND BRIAN JAMES BECKWITH

### Appeal from the Circuit Court for Hardin County
No. 9649     C. Creed McGinley, Judge

### No. W2013-02368-CCA-R3-CD  -  Filed May 22, 2015

The Defendant-Appellants, Gerald Stephen Cassell and Brian James Beckwith, were jointly convicted by a Hardin County jury of one count of aggravated robbery, a Class B felony. See T.C.A. § 39-13-402. The trial court ordered each Defendant to serve twelve years in the Tennessee Department of Correction, consecutive to their unserved sentences in Florida. In this consolidated appeal, the Defendants argue that the trial court erred in denying their motion to suppress a witness's pretrial and trial identifications of them, the evidence is insufficient to sustain their aggravated robbery conviction, and the trial court erred in sentencing them. In addition, Cassell argues that the trial court erred in admitting witness testimony regarding the contents of a WalMart surveillance video. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Guy T. Wilkinson (on appeal), District Public Defender, Camden, Tennessee; and Benjamin S. Harmon (at trial), Savannah, Tennessee, for the Defendant-Appellant, Gerald Stephen Cassell.

Joe L. Brown, Savannah, Tennessee, for the Defendant-Appellant, Brian James Beckwith.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Hansel J. McCadams, District Attorney General; and Ed N. McDaniel, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This appeal stems from the robbery of Livingston's Jewelry in Savannah, Tennessee by two individuals on the afternoon of April 16, 2012. The Hardin County Grand Jury jointly indicted Cassell and Beckwith after they were implicated in the robbery. Prior to trial, both Defendants filed motions to suppress identification evidence and to preclude eyewitness testimony regarding identification.

**Suppression Hearing.** William Bell testified that he was previously a police officer in Maryland for about twenty-four years before retiring and moving to Hardin County, Tennessee. On April 16, 2012, he and his eleven-year-old daughter were in Livingston's Jewelry when an armed robbery occurred. He said that he "got a good look" at one of the men whose face was uncovered when the man entered the store. Bell further stated that he "got a very good look" at the other man who first entered the store with his face covered up to the nose, but whose face was later uncovered when he left.

As the men were leaving, one man asked Bell and store owner Randy Livingston for their car keys. Bell then obtained a handgun from Livingston and pursued the men. Bell said that he recognized the men from the jewelry store but not because of photographs that had been shown to him by the police. Bell stated that he observed the two men as they entered the store, while they were in the store, and when they left. He identified the Defendants as the men who had robbed the jewelry store.

During cross-examination by Cassell's attorney, Bell said that he was involved in many robbery investigations while he was a police officer in Maryland. Prior to this incident, he had been in Livingston's Jewelry once before. On the day of the robbery, he and his daughter were in the back of the store near the cash register. Bell said that it was immediately apparent that the men were robbing the store because the man with the covered face had a gun in his hand and the other man had a bag. Bell said that the two men were in the store for about five minutes, and he observed them the entire time. He testified that he stared directly at both men because they kept ordering him to keep his hands on his head.

On the day of the incident, Bell provided a statement to police and was shown some photographs. He could not recall during the hearing whether he identified both individuals from a photographic lineup on the day of the robbery or on the following day. He agreed that the Savannah police showed him a still photograph from a Walmart surveillance video of just the two suspects, but he was unsure whether he was shown that picture before or after the photographic lineup. When he was shown the Walmart picture, the police asked him if he could identify the men. The police did not tell him that the two men in the photograph were the robbery suspects. He denied that he saw pictures of the

-2-

Defendants on television or in the newspaper. Bell believed that both Defendants were included in the same photographic lineup. He said he could identify the Defendants' faces, but he did not know their names.

During cross-examination by Beckwith's attorney, Bell said that he could see the suspects through both his direct and peripheral vision. He stated that the unarmed man approached him several times and told him to keep his hands on his head. He said that the other man did not have his face covered with a shirt the entire time, and he observed the man's face multiple times while the man was near the safe. Bell agreed that he had identified pictures two and five from a lineup of six photographs with 100 percent certainty. He testified that he did not pay attention to the background of the pictures in the lineup.

After the State's proof, Cassell's attorney called Officer T.J. Barker, a twenty-one year veteran of the Savannah Police Department. Officer Barker investigated the instant robbery at Livingston's Jewelry, interviewed Bell and Livingston, and spoke to witnesses who saw a small red car leave the scene. On April 17, he took a statement from Bell at the police department, showed him surveillance photographs from WalMart, and asked Bell if he recognized the two men. The police had obtained photographs from Walmart because the robbery suspects left duct tape at the crime scene, and some duct tape had been stolen from Walmart that day. These still photographs from Walmart were released to the media and depicted the Defendants entering the store as well as their clothing and vehicle.

Officer Barker acknowledged that Bell returned to the police station on April 23, 2012, to view a lineup of six photographs. He agreed that Bell had already viewed the Walmart surveillance photographs of the two Defendants. Officer Barker compiled the lineup based on the description of the robbery suspects, and he used photographs of men with very short dark hair as well as men with light hair. While compiling the lineup, he did not notice a difference between the backgrounds of the two suspects and the other four men. Officer Barker thought the photographs were "pretty close," and he advised the witnesses that the lineup may or may not include photographs of the guilty parties. He agreed that Bell identified only one suspect on the day of the robbery and then identified both men the following day based on the Walmart photographs. He said that the lineup consisted of color photographs.

Following the hearing, the trial court made oral findings and denied the motion to suppress. The court concluded that the identification procedure was not unduly suggestive and that the identification was reliable under the totality of the circumstances.

**Trial.**  Randy Livingston testified that he had owned Livingston's Jewelry in downtown Savannah, Tennessee for the past thirty-five years.  On April 16, 2012, he was estimating the cost of a ring repair for William Bell and Bell's minor daughter when two men entered the store.  The man who was armed with a gun said, "'This is a robbery.  Everybody on the floor.'"  After Bell and his daughter were on the ground, the unarmed man began removing diamond jewelry from the floor cases, and the armed man demanded that Livingston open the safe.  Livingston complied and gave the man a money clip with $200.  The man also took some scrap gold from the safe and about $700 from the cash register.  The robbers continued to remove items from behind the jewelry counters and placed them in a canvas tent bag.  Livingston estimated that the men were in the store for five minutes.

Livingston stated that he had never experienced a robbery at his business before and that he had installed video surveillance after the incident.  He cooperated with the robbers because he was concerned for the safety of his customers.  When the robbers left, Bell identified himself as a retired police officer and asked for a firearm, which Livingston gave him.  Livingston immediately called the police as Bell chased after the men.  He said that Bell later returned with the robbers' bag.  Livingston valued the jewelry inside the bag to be worth almost $27,000.  However, he never recovered any of the cash or three bracelets valued at around $560.  He identified the Defendants in court as the men who, "[w]ithout a doubt," robbed his store on April 16, 2012.

During cross-examination by Cassell's attorney, Livingston said that the robbers produced "an automatic weapon" as soon as they entered the store.  He did not believe that the men wore gloves, though he stated that he paid more attention to the gun and to their faces than to their clothing.  He said that he was not on the floor for long because the men ordered him to open the safe and the cash register.  Livingston stated that the two men had close-cropped hair and were about five feet and nine inches tall.  He said that the armed man was wearing a cap and had his T-shirt pulled up over his face, but his face was only briefly covered.  The unarmed man was wearing sunglasses.  He testified that he "got a very good look at them."  Livingston agreed that he provided a police statement on April 16 but stated that he was testifying from firsthand experience.  He told the police that he was not certain about clothing but that he paid attention to the facial structure of the men.  He acknowledged that he might have initially told the dispatcher that one of the men had a bandana or handkerchief over his face, but he testified that the man's face was covered with a pulled-up T-shirt.  Livingston said that he never identified the robbers from any pictures, though he identified them at a preliminary hearing.  He agreed that he saw Walmart photographs of the Defendants.  During cross-examination by Beckwith's attorney, Livingston testified that the preliminary hearing occurred a year ago and that only Cassell was present.

William Bell provided the same testimony as he did at the hearing on the motion to suppress. In addition, he said that he began his law enforcement career as a patrol officer and spent several years as a detective, a K-9 officer, and an undercover narcotics officer. He agreed that his training enabled him to recognize individuals better. He stated that the armed robbery occurred at around 3:40 p.m. on April 16, 2012, because he had just picked his daughter up from school, and they went directly to Livingston's Jewelry. The man who "was holding a semi-automatic stainless steel revolver" ordered Livingston to open the safe, and the other man took pieces of jewelry from the cases and put them into a blue bag. Bell could clearly see the unarmed man because his face was uncovered and because they spoke to each other after the man repeatedly asked him to keep his hands on his head. The armed man had his lower face covered to the tip of his nose when he entered the store, but Bell could clearly see the man's face as he left because his face was uncovered. He said he "made a lot of eye contact" with the armed man because he was concerned with how the robbery would end. Bell concentrated on the facial features of the suspects due to his law enforcement training and because he feared for the safety of his young daughter. He stated, "[I]f someone points a weapon at my eleven-year-old daughter, it's a face I'm going to remember." He identified the Defendants in court as the perpetrators of the robbery and said he had "absolutely" no doubt in his mind.

Bell further testified that when he confronted the unarmed man with the bag outside of the store, the suspect ran away. The man then slipped and dropped his bag and continued running past some restaurants. After the robbers disappeared from view, Bell recovered the bag and returned to the store. On the evening of the robbery, the police showed him some photographs. The following day, the police showed him a picture of two men entering Walmart and asked if he could identify them. Bell said he recognized the men in the picture as the robbery suspects. The Walmart photograph was time-stamped "4/16/2012 14:14:37" and was admitted into evidence.

During cross-examination by Cassell's attorney, Bell agreed that he told police that the perpetrators were "white males, mid-twenties, thin build[.]" He did not recall describing the robbers' hair or clothing. He disagreed that his description was vague because articles of clothing could be discarded or altered. Bell denied that he had difficulty seeing the robbery suspects while he was kneeling on the floor. He agreed that the police showed him Walmart surveillance photographs of the Defendants. However, he disagreed that the police asked him, "Are these the guys?" Bell acknowledged that he was shown a photographic lineup of six individuals at a later date. During cross-examination by Beckwith's attorney, Bell stated that he observed the man whose face was no longer covered for about fifteen seconds. He believed that he first identified the other suspect during the photographic lineup. He was only aware of two robbery suspects.

Christy Shelby and Kamela Hill were parked outside of Livingston's on the day of the offense. Each witness testified that at around 3:30 or 4:00 p.m. they observed two men run out of the jewelry store. Shelby saw one man with the duffle bag run into the middle of the road and then drop the bag there. She then observed another man exit the store with a gun at his side. Shelby did not recognize the two men at the time, but she later saw their picture in the newspaper and identified them as the individuals who had robbed the jewelry store. Hill observed that the men were dressed oddly for a hot day and thought to herself, "[H]e looks just like somebody who would be a robber on TV." She noticed that one man had a large, dark duffle bag. She watched as he darted through the parked cars and crossed the street. Hill then saw Bell exit the store and yell across the street. When she turned around, she saw the bag in the middle of the road and the suspects leaving through the alley. She later saw pictures of the two men in the newspaper.

On cross-examination, Shelby stated that the two men who exited Livingston's Jewelry were running quickly. She did not observe any individual looking into the window of a vehicle. She agreed that the third man who left the store was also running. Shelby did not recall seeing the two suspects with a gun, though she did observe the third man with a gun at his side. In her police statement from the day of the robbery, she described the men as wearing a hat, sunglasses, and long sleeves. She saw several photographs at the time, but they were not pictures from Walmart. Shelby did not know why her police statement was dated April 18, 2012. Hill said that she did not notice the first suspect, but she did see the second man walking quickly. She said that he was definitely wearing a hat and sunglasses. She stated that the men were about to run across the street when Bell yelled for them to stop. She agreed that the newspaper picture was next to an article about the robbery suspects.

Jamie Franks was also parked near Livingston's Jewelry on the day of the offense. He testifed that while he was in his truck, he observed two suspicious men running from behind the building. They appeared to be out-of-breath and paused for a few seconds to speak to each other. Franks observed one of the men remove his hat and throw it on the ground. They fled the scene in a red Pontiac Grand Am that was parked there. The vehicle did not have a Tennessee license plate. Franks heard sirens and saw a police car drive by, but he did not know what had happened. On cross-examination, Franks said that the two men were about twenty yards from his truck. He did not recall seeing either man wearing any sunglasses or bandanas. He said that the men were in their mid-twenties and were about five feet and eight or ten inches tall. He did not clearly see their faces.

Investigator Timmy Keen of the Savannah Police Department testified that he responded to an armed robbery call at Livingston's Jewelry on April 16, 2012. After he

arrived at the scene, Bell provided him with a blue tent bag that contained jewelry and other items, including two rolls of duct tape. On cross-examination, Investigator Keen said that on the day of the robbery, he secured the crime scene, interviewed some witnesses, and contacted Walmart. The police obtained formal statements from witnesses on the following day.

In a bench conference, Cassell's attorney objected to any testimony from Walmart employee Jeanie Coffman regarding the contents of a surveillance video from the store, asserting a violation of the best evidence rule. The trial court overruled the objection and held that the defense could renew the objection during the witness's testimony. Jeanie Coffman, the loss prevention manager at the Walmart store in Savannah, testified that on April 16, 2012, Investigator Keen contacted her and asked if the store was missing any rolls of duct tape. When she advised the police that there were two rolls missing, Investigator Keen asked her to determine who had taken the tape. Coffman reviewed the surveillance videos from the store's security cameras and created numerous still photographs from the recordings. She identified photographs from April 16, 2012, of two individuals in the Walmart parking lot and inside the store. There were also photographs of a red car in the parking lot, and the earliest photograph was time-stamped "14:12:59," or 2:12 p.m. Coffman said that she selected still photographs of these two individuals because she reviewed the video surveillance and saw them shoplift duct tape. The Walmart photographs were admitted into evidence as a collective exhibit.

On cross-examination, Coffman conceded that the surveillance photographs did not include any pictures of duct tape. She said that the duct tape was shown in the video recording, which was not available at trial. She testified with 100 percent certainty that the two missing rolls of duct tape from Walmart were the same as the duct tape recovered from Livingston's Jewelry. She said that the duct tape was Gorilla brand and had a different size, color, and label from the other duct tape that was sold at Walmart. Coffman filed a police report for the missing duct tape, though the matter was never prosecuted. She acknowledged that other stores in Savannah might also sell Gorilla brand duct tape.

Officer T.J. Barker of the Savannah Police Department testified that he became involved with the robbery investigation on April 17, 2012, because he had the day off on April 16. He recalled that the police released the Walmart surveillance photograph to the local media on April 18 or 19. Officer Barker did not learn the names of the two individuals in the photograph until April 23. At that point, he compiled a photographic lineup, which was shown to Bell at the police station. He said that Bell identified the two Defendants as the perpetrators. Officer Barker then issued warrants and entered them into a national criminal database. Cassell was later apprehended in Toledo, Ohio, and Beckwith was apprehended in Chicago, Illinois. On cross-examination, Officer Barker

agreed that he showed the Walmart photograph of the two Defendants to Bell on April 17. On April 23, he asked Bell to review a six-person photographic lineup, and Bell identified the two Defendants as the robbers. He said he showed a lineup to Bell because Bell had been in close proximity to the two suspects at the crime scene. Officer Barker stated that other eyewitnesses had also identified the Defendants as the perpetrators based on the Walmart surveillance photograph.

Cassell and Beckwith elected not to testify and did not present any proof. Based on the evidence, the jury convicted them as charged of aggravated robbery.

**Sentencing Hearing.** At the joint sentencing hearing, the State introduced each of the Defendants' presentence reports into evidence. Both reports included a victim impact statement from Randy Livingston. Neither the State nor the Defendants called any witnesses.

Cassell's presentence report reflected that he was twenty-five years old at the time of the robbery and a resident of Florida. His prior record included a robbery conviction in 2007 in Pinellas County, Florida, when he was twenty years old. According to the report, Cassell robbed a federal credit union without a weapon, though the money was later recovered. He was sentenced to serve four years in the Florida Department of Correction followed by one year of probation. His adult record also included various drug offenses that were committed when Cassell was nineteen. His juvenile record began at age thirteen and included offenses such as burglary, possession of a weapon on school grounds, battery, and possession of drug paraphernalia. The report further stated that Cassell and Beckwith were cousins.

Beckwith's presentence report reflected that he was thirty-three years old at the time of the robbery in April 2012. In August 2012, he was convicted of being a felon in possession of a weapon in Cook County, Illinois, after he was apprehended there in May 2012. In 2007, Beckwith was convicted of unarmed robbery in Pinellas County, Florida, and received a five-year sentence.[1] The presentence report also indicated that Beckwith had periods of incarceration in Florida with multiple infractions during his time in prison. He was first incarcerated in 1996 in Florida for an armed robbery that occurred when he was sixteen. Beckwith had been charged as a juvenile for that offense but was later treated as an adult.

---

[1] Although not specified in the presentence reports, it appears that the Defendants committed the unarmed robbery in Pinellas County, Florida, together. The offense occurred on February 12, 2007, and Cassell was convicted in case number 07-03271 while Beckwith was convicted in case number 07-03272.

At the conclusion of the hearing, the trial court sentenced each Defendant as a Range I, standard offender to twelve years in the Tennessee Department of Correction and aligned the sentences consecutively to their prior sentences in Florida. Cassell filed a motion for new trial, which the trial court denied on January 6, 2014. Beckwith did not file a motion for new trial. Both Defendants timely appealed the judgments of the trial court.

## ANALYSIS

**I. Motion to Suppress.** On appeal, Cassell and Beckwith argue that the trial court should have suppressed William Bell's pretrial and in-court identification of them because the procedure was unduly suggestive and violated their due process rights. Specifically, the Defendants contend that Bell's identification was unreliable because he identified an unspecified suspect on the day of the robbery, the police showed him a Walmart photograph of the two Defendants prior to a photographic lineup, and the lineup included both Defendants in the same array. The Defendants further assert that the lineup "clearly highlights" them because the other four photographs have a superimposed diamond and height markings in the background. The State responds that the photographic identification was not unduly suggestive or unreliable, and the trial court properly admitted the evidence. We agree with the State.

An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the

evidence preponderates against the trial court's findings.  Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)).  "[E]ven if the identification procedure were unnecessarily suggestive, suppression is only required when the totality of the circumstances shows that the identification was unreliable." State v. Scarborough, 300 S.W.3d 717, 729 (Tenn. Crim. App. 2009) (citing Neil v. Biggers, 409 U.S. 188, 198–99 (1972).  In Neil v. Biggers, the Court established a two-part analysis that the trial court must apply in determining the validity of a pre-trial identification.  409 U.S. at 198-99.  First, the trial court must determine whether the identification procedure was unduly suggestive.  Id. at 198.  Next, if the trial court determines that the identification was unduly suggestive, then it must consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable.  Id. at 199.  This court must consider the following factors in determining the reliability of an identification:

1. the opportunity of the witness to view the criminal at the time of the crime.
2. the witness's degree of attention at the time of the crime.
3. the accuracy of the witness's prior description of the criminal.
4. the level of certainty demonstrated by the witness at the confrontation.
5. the length of time between the crime and the confrontation.

State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 199); see State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).  In Tennessee, it is unnecessary to apply the totality of the circumstances test in Biggers to assess the reliability of the identification if the trial court determines that the identification procedure was not unduly suggestive.  See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

The "showup" method involves the presentation of a suspect or a single photograph of the suspect to a witness.  Id.  Courts generally condemn the use of a showup because it is considered to be "inherently suggestive and unfair" to the suspect. State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989).  Nevertheless, a showup is not unnecessarily suggestive when "imperative circumstances necessitate" its use or when it occurs "as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. at 381.  This court has explained that a showup, when used as an investigatory procedure sufficiently proximate in both time and place to the offense, often

serves the interests of justice. State v. Moore, 596 S.W.2d 841, 844 (Tenn. Crim. App. 1980). It can "'foster[] the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.'" Id. (quoting Bates v. United States, 405 F.2d 1104, 1106 (D.C. Cir. 1968)); see also Simmons, 390 U.S. at 384-85 (concluding that photographic identification was justified under the circumstances because the armed bank robbers were still at large, a serious felony had been committed, law enforcement officials possessed inconclusive clues which led them to the suspects, and they had to swiftly determine "whether they were on the right track[.]"). A showup identification, therefore, violates due process only when it is unnecessarily suggestive and unreliable.

Physical and photographic lineups are the preferred methods of identification. Cribbs, 967 S.W.2d at 794. The Tennessee Supreme Court has held that photographic lineups are admissible unless they are unduly suggestive:

> Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from "suggestive identification procedures." Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Thus, a photographic identification is admissible unless, based upon the totality of the circumstances, "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967).

Hall, 976 S.W.2d at 153. The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." Simmons, 390 U.S. at 383. In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Id. This court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing U.S. v. Wade, 388 U.S. 218, 233 (1967); Shye v. State, 506 S.W.2d 169, 173 (Tenn. Crim. App. 1973); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

Here, the trial court concluded at the suppression hearing that there was "nothing whatsoever in this record to even remotely suggest that this was a suggestive procedure or anything that was geared to make Mr. Bell identify these Defendants." Notwithstanding this finding, the court also considered the totality of the circumstances and determined that Bell had the opportunity to view the Defendants during the robbery

with "rapt" attention. The court noted that the witness had prior law enforcement training and had testified in detail regarding his efforts to observe the Defendants both directly and indirectly. The court found that Bell's description of the perpetrators was not at odds with the individuals who were subsequently arrested. It also found that Bell had demonstrated 100 percent certainty at the confrontation and that the length of time between the robbery and the confrontation was "very short[.]"

The trial court found that the Walmart surveillance photographs were "simply routine police work" because investigators had determined that the suspects left duct tape at the crime scene and that the tape could have been purchased or shoplifted from Walmart. In reviewing the photographic lineup, the court concluded that it was "the most unsuggestive lineup" that the court had ever seen. It found that Bell had identified photographs 2 and 5 in the lineup as the Defendants. The court noted that photograph 3 looked like "it could be a twin brother" of Cassell and that photographs 1 and 4 had similar facial features. The court acknowledged that the individual in photograph 6 appeared less similar to Beckwith but concluded that the lineup was not unduly suggestive.

After reviewing the record, we conclude that the evidence fully supports the trial court's denial of the motion to suppress based on its finding that there was nothing unduly suggestive about the identification procedure. The record establishes that the robbery occurred sometime between 3:30 and 4:00 p.m. after the school day had ended on April 16, 2012. One robbery suspect had initially used his shirt to conceal his face, but his face was later uncovered. The second suspect did not cover his face. After fleeing the crime scene, the suspects left a canvas bag with two rolls of Gorilla brand duct tape. Earlier in the afternoon, at around 2:14 p.m., the Defendants were seen in Walmart surveillance photographs, and it was later discovered that duct tape was missing from the store's inventory. Investigators developed the Defendants as robbery suspects based on their presence at Walmart and their red vehicle. Without knowing the identities of the two men, the police showed Bell the Walmart photograph the day after the robbery, while the suspects were armed and still at large. The Walmart photograph is dark and depicts the profiles of two men entering the store. The facial features of the men are unclear, but their profile, height and build are apparent. Bell testified that he had observed the robbers for five minutes and that he could clearly see their faces. After he was shown the surveillance photograph, Bell confirmed to police that the individuals were involved in the robbery. Under these circumstances, the showup identification was justified and not unnecessarily suggestive. See Moore, 596 S.W.2d at 844; see also Simmons, 390 U.S. at 384-85.

We further conclude that the photographic lineup was not unduly suggestive. When the police learned the identities of the Defendants, they compiled a lineup with six

color photographs depicting clear facial features from the neck up. On April 23, seven days after the robbery, Bell positively identified the two Defendants from the photographic lineup. All of the photographs depict men with close-cropped hair and similar facial features. The six men have their eyes open and their mouths closed. Although the Defendants are correct that their photographs do not contain height indicators or superimposed diagonal lines, we disagree that the lineup "clearly highlights" them. We agree with the trial court that photograph 6 is the most dissimilar individual, but we reiterate that the "[p]hotographs contained in a photographic array do not have to mirror the accused." Hall, 976 S.W.2d at 153. Here, Bell was specifically advised that the lineup may or may not include the guilty parties. He testified that he did not pay attention to the backgrounds in the lineup and that he was 100 percent positive regarding his identification of the Defendants. Upon review of the six photographs, we cannot conclude that the Defendants' photographs were "grossly dissimilar" to the others. Edwards, 868 S.W.2d at 694.

Moreover, the totality of the circumstances reflects that Bell's identification was reliable. See Biggers, 409 U.S. at 199. First, Bell had the opportunity to view the robbery suspects in the jewelry store for five minutes. The incident occurred during the day, and Bell had an unobstructed view of the suspects' faces. Bell also had the opportunity to view the suspects when he pursued them on foot after the robbery. Second, Bell testified that he observed the men during the entire course of the robbery and that he "made a lot of eye contact" with the armed man because he was concerned about how the incident would end. Moreover, as an experienced former police officer, Bell was able to pay closer attention to the suspects than a casual observer would. See, e.g., State v. Biggs, 211 S.W.3d 744, 751-52 (Tenn. Crim. App. 2006) (citing cases that recognize the difference in observations between trained law enforcement and lay witnesses); see also Manson v. Brathwaite, 432 U.S. 98, 115 (1977). Third, Bell described the suspects as white males in their early twenties with thin builds. Although his description was general in nature, it was accurate. Fourth, Bell testified at the suppression hearing that he was 100 percent certain of his identification of the Defendants. Bell further identified the Defendants at trial with absolutely no doubt in his mind.[2] Finally, Bell identified the Defendants from a photographic lineup only one week after the robbery. Under these circumstances, we conclude that the trial court did not err in denying the Defendants' motion to suppress. Moreover, because we conclude that the Defendants are not entitled to relief on this issue, we need not consider Beckwith's argument that the trial court committed plain error in admitting identification evidence.

---

[2] Although the Defendants appear to argue that Bell's identification was unreliable because he identified an unspecified third suspect on the day of the robbery, the record does not support this claim. At the suppression hearing, Bell conceded that he could not recall exactly when and what he was shown by the police, but he testified that he was confident in his identification of the Defendants.

**II. Evidentiary Ruling.** Cassell argues that the trial court erred in allowing Jeanie Coffman to testify about the contents of the Walmart surveillance video. He asserts that the testimony violated the best evidence rule and was inadmissible hearsay. We understand Cassell's argument to be that Coffman should not have testified that she observed the Defendants shoplift duct tape in the surveillance video without presenting any video recording or still photographs depicting the Defendants removing the tape. The State responds that Cassell has waived this evidentiary issue and that any error was harmless. We agree with the State.

Initially, we note that Cassell has failed to include the transcript from the motion for new trial hearing in the record on appeal. The appellant has the burden of ensuring that the appellate record contains a fair, accurate, and complete account of what has occurred regarding the issues that are the bases of the appeal. See Tenn. R. App. P. 24(b); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

In his motion for new trial, Cassell argued as follows:

> The testimony of Jeanie Wilburn [sic] as to what the closed circuit video of the suspects at Walmart in Savannah, Tennessee [depicted] should not have been admitted as it violated both the best evidence rule and the hearsay rule. The video was never provided to the Defendant to examine and therefore the Defendant's right to cross examine witnesses against him was violated.

In a written order filed on January 6, 2014, the trial court denied Cassell's motion, noting that the matter was heard on November 25, 2013. We cannot speculate regarding the trial court's reasoning in the absence of the transcript from the hearing. Accordingly, we conclude that the trial court properly admitted the witness's testimony at trial.

Waiver notwithstanding, we note that "[g]enerally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." Id. at 402. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. at 403.

Here, the trial court properly admitted Coffman's testimony. Coffman testified regarding what she personally viewed on the Walmart surveillance video, and the contents were extremely probative as evidence of Cassell's guilt. Still photographs of the Defendants from the video matched the descriptions provided by witnesses at the scene of the robbery. The still photographs from Walmart also depicted a red car that was similar to the vehicle that Jamie Franks witnessed leaving the crime scene. Investigators contacted Walmart to determine if any Gorilla duct tape was missing, and the store reported that two rolls had been stolen. The probative value of Coffman's testimony substantially outweighed any danger of unfair prejudice to the Defendants. Finally, in light of the eyewitness testimony identifying the Defendants as the perpetrators of the armed robbery at Livingston's Jewelry, Cassell cannot show that any erroneous admission of Coffman's testimony "more probably than not affected the outcome of the trial." See State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (when assessing the impact of a non-constitutional error, the reviewing court may appropriately consider the properly admitted evidence of a defendant's guilt). Accordingly, Cassell is not entitled to relief on this issue.

**III. Sufficiency of the Evidence.** Next, the Defendants argue that the evidence is insufficient to sustain their convictions for aggravated robbery. Specifically, they contend that the State failed to prove their identities as the perpetrators beyond a reasonable doubt. They maintain that their convictions were based on unreliable eyewitness testimony that was influenced by a highly suggestive Walmart photograph.[3] The State responds that there is sufficient proof to support the Defendants' convictions and that the jury accredited the State's witnesses. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). This court has often stated that "[a] guilty verdict by the jury, approved by the

---

[3] It should be noted that Cassell and Beckwith do not dispute that they are the individuals depicted in the still photograph from the Walmart surveillance video.

trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id. Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)).

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. Cribbs, 967 S.W.2d at 779. The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87).

Here, Cassell and Beckwith do not dispute that an armed robbery took place at Livingston's Jewelry. Instead, they argue that the proof is insufficient to establish their identities as the perpetrators of the offense. They assert that although store owner Randy Livingston testified that he could clearly see the perpetrators, he never made an out-of-court identification of them. They further assert that retired police officer William Bell, unlike other witnesses, never described the fact that one suspect wore a hat and the other had sunglasses. The Defendants also claim that Christy Shelby and Kamela Hill provided conflicting testimony and could not identify the suspects until they saw a Walmart photograph. They note that Jamie Franks observed two men running to their car from a distance and could not see their faces. Finally, the Defendants complain that although Jeanie Coffman testified that she saw the Defendants steal duct tape from the surveillance video, she failed to present any video or photographs of them removing the duct tape.

Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found Cassell and Beckwith guilty of aggravated robbery beyond a reasonable doubt. The incident occurred in broad daylight on a Monday afternoon in downtown Savannah, Tennessee. At trial, Livingston testified that he got a "got a very good look" of the perpetrators, and he identified Cassell and Beckwith "without a doubt" as the men who had robbed his store. Both Livingston and Bell stated that they observed the men for five minutes in the store and that the suspects' faces were not covered the entire time. Bell further testified that he concentrated on the facial features of the suspects and that he would not forget the face of a person who pointed a gun at his daughter. He positively identified the Defendants in a photographic lineup seven days after the robbery, once the police learned the identities of the suspects. Bell

-17-

also identified the Defendants at trial as the perpetrators with absolutely no doubt in his mind. This testimony, alone, is sufficient to sustain the convictions for both Defendants. See Radley, 29 S.W.3d at 537; Strickland, 885 S.W.2d at 87. Shelby and Hill each stated that they did not recognize the Defendants at the time of the robbery, but they identified them as the robbers once they saw the Walmart photograph in the newspaper. Although Franks could not clearly see the faces of the two men who fled in a red Pontiac, he testified that the men were in their twenties and were about five feet and eight or ten inches tall. Moreover, the State admitted the Walmart still photographs from April 16, 2012, into evidence, and the jury had the opportunity to compare the photographs with the Defendants in court.

Cassell and Beckwith emphasize the discrepancies in the witness descriptions of the perpetrators. However, the conflicts in the evidence were effectively presented to the jury during cross-examination, and the jury chose to accredit the States' witnesses. We will not reweigh or reevaluate the evidence. Despite inconsistencies in the witness testimony regarding particular details, the State's witnesses were confident in their identifications of the Defendants. Based on the evidence, a rational trier of fact could conclude beyond a reasonable doubt that the State established the Defendants' identities as the perpetrators of the armed robbery at Livingston's Jewelry on April 16, 2012. Accordingly, they are not entitled to relief on this issue.

**IV. Sentencing.** Finally, the Defendants argue that the trial court erred in sentencing them to twelve years' imprisonment consecutive "to anything pending in Florida." Specifically, Cassell asserts that he should not have received the same maximum sentence as his co-defendant given that he was unarmed during the robbery and only had one prior robbery in his record. Both Defendants contend that trial court erred in ordering consecutive sentencing because "[i]f there was a sentence to be served in Florida, the State should know. Otherwise, it would be up to Florida to determine if any future sentence should be served consecutively or concurrently." The State responds that the trial court properly sentenced the Defendants. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, the misapplication of enhancement or mitigating factors does not invalidate the imposed sentence "unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). A trial court abuses its discretion only when it "applie[s] an incorrect legal

standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997); see also State v. Kyto Sihapanya, ___ S.W.3d ___, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *2 (Tenn. Apr. 30, 2014).

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts.

The trial court sentenced Cassell and Beckwith as Range I, standard offenders to twelve years in the Department of Correction for aggravated robbery, a Class B felony. See T.C.A. § 39-13-402. In imposing the maximum sentence in the range, the court found that both Defendants had a prior history of criminal convictions or criminal behavior, in addition to those necessary to establish the range. See id. § 40-35-105, -112(a)(2), -114(1). The court was particularly concerned that the Defendants had prior robbery convictions and emphasized the fact that Beckwith had two robbery convictions as well as weapons-related charges. Based on its review of the presentence reports, the court noted that the Defendants had apparently committed a robbery together in 2007.

Cassell argues that the trial court erred in imposing the maximum sentence in the range. He asserts that the court "was influenced" by Beckwith's record when imposing the "same maximum sentence." Here, the court stated that enhancement factor (1) was "the primary enhancing factor" for both Defendants. A review of Cassell's prior convictions shows that he possessed a juvenile and adult criminal history "evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation" and, therefore, was properly given "first priority regarding sentencing involving incarceration[.]" T.C.A. § 40-35-102(5). The record further reflects that the

Defendants were cousins who first committed a robbery together in 2007 in Florida and then committed armed robbery of a jewelry store in Tennessee after their release from prison in August 2011. Therefore, the maximum sentence was "justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). Moreover, we note that the Defendants did not receive the "same" sentence, because the court sentenced Cassell at 85 percent release eligibility and Beckwith at 100 percent. See id. § 40-35-501(k)(1), (2) (requiring a sentence for aggravated robbery to be served at 85 percent or at 100 percent for individuals with prior aggravated robbery convictions). We conclude that the trial court did not impose an excessive sentence in Cassell's case.

Next, both Defendants contend that the trial court improperly imposed consecutive sentencing. When a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Id. § 40-35-115(a). The Tennessee Supreme Court has held "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). T.C.A. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Pollard, 432 S.W.3d at 861. Moreover, "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

After the trial court imposed a twelve-year sentence at the sentencing hearing, the State requested that the court align the sentence "consecutive to anything that's pending in Florida [.]" In ordering consecutive sentencing, the court found by a preponderance of the evidence that Cassell and Beckwith were professional criminals, were offenders whose record of criminal activity was extensive, and were dangerous offenders whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. T.C.A. § 40-35-115(b)(1), (2), (4). The court found that the risk to human life was high because the robbery occurred in the

presence of a minor child and both the child and the store owner were forced to lie face down on the ground. Accordingly, Cassell and Beckwith's judgments reflect that the instant sentence should be served consecutive to "Fla convictions[.]"

As previously noted, the existence of only one factor is sufficient to impose consecutive sentencing. See Pollard, 423 S.W.3d at 862; T.C.A. § 40-35-115(b). This court has held that "an extensive criminal history, standing alone, is enough to justify the imposition of consecutive sentencing." State v. Nelson, 275 S.W.3d 851, 870 (Tenn. Crim. App. 2008) (citing State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997)). In the case of both Cassell and Beckwith, the record fully supports the trial court's finding that they were offenders whose record of criminal activity was extensive. See T.C.A. § 40-35-115(b)(2).

Cassell's juvenile record began in 2000, at age thirteen, when he was fined for possession of tobacco products. At age fifteen, he was found guilty of battery, burglary, attempted burglary of an automobile, possession of marijuana and possession of drug paraphernalia. After his driver's license was suspended for two years at age seventeen, Cassell was convicted of leaving the scene of an accident about a month later and was found in contempt for driving. Cassell's adult record includes five drug-related convictions committed when he was nineteen and a robbery conviction at age twenty.

Beckwith's presentence report did not contain information regarding his juvenile record. However, he was treated as an adult at age sixteen after committing armed robbery in 1995. For that offense, he served four years in a Florida prison and was released to two years' probation in June 1999. He was resentenced to prison for violating his probation six months after his release in 2000. After his subsequent release to probation in 2003, Beckwith returned to prison in 2007 after he was convicted of being a felon in possession of a weapon and simple possession. He was paroled in 2011 after serving a five-year sentence for an unarmed robbery committed in 2007. After the armed robbery occurred at Livingston's Jewelry in April 2012, Beckwith was apprehended in Chicago in May 2012 and convicted in Illinois of being a felon in possession of a weapon.

Based on the Defendants' criminal backgrounds, the trial court was well within its discretion in ordering consecutive sentencing. Moreover, the record supports a finding that Cassell and Beckwith had a long history of criminal conduct and that measures less restrictive than confinement had frequently or recently been applied unsuccessfully to them. See id. § 40-35-103(1)(A), (C). Therefore, the trial court properly exercised its discretion in ordering the Defendants to serve their sentences consecutively.

"[W]hile consecutive sentences are discretionary, in a few instances, consecutive sentences are mandated either by statute or by Tenn. R. Crim. P. 32." Id. § 40-35-115(d),

Sentencing Comm'n Cmts. Although not specifically relied upon by the trial court, we note that Tennessee Rule of Criminal Procedure 32(c)(2)(B) provides:

> If, as the result of conviction in another state or in federal court, the defendant has any additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

Tenn. R. Crim. P. 32(c)(2)(B). According to their presentence reports, both Cassell and Beckwith were convicted of a robbery that occurred in Pinellas County, Florida, on February 12, 2007. Cassell's presentence report stated that Florida had a detainer on him for the prior robbery conviction. Because the disposition date was August 18, 2007, it appears that Cassell would have been released on probation on or around August 18, 2011. Beckwith received a five-year sentence for the 2007 robbery and was paroled on August 12, 2011, about eight months before the armed robbery occurred in Savannah, Tennessee. We conclude that the trial court did not abuse its discretion in ordering the Defendants to serve their Tennessee sentence consecutive to their previously imposed, unserved Florida sentence. Accordingly, we uphold the length and consecutive alignment of the Defendants' sentences, and they are not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgments of the Hardin County Circuit Court.

_____
CAMILLE R. MCMULLEN, JUDGE